UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHARLES V. FARNSWORTH,

                    Petitioner,

        v.

JERI BOE,

                    Respondent.

CASE NO. 3:20-cv-05067-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR:  September 17, 2021

The District Court has referred this petition for a writ of habeas corpus under 28 U.S.C. § 2254 to United States Magistrate Judge J. Richard Creatura, as authorized by 28 U.S.C. § 636(b)(1) and local Magistrate Judge Rules 3 and 4.

After a jury convicted petitioner of first-degree robbery of a financial institution as an accomplice, a Washington State superior court sentenced petitioner to life in prison without the possibility of parole.  Petitioner's accomplice, who entered the bank while petitioner remained in the getaway vehicle, gave detailed testimony implicating petitioner at the trial.

Petitioner now raises a number of arguments challenging the validity of his conviction. Petitioner challenges the trial court's decision not to admit the accomplice's plea agreement, "discovery documents" allegedly contradicting the accomplice's claimed motivation for testifying, or evidence of the accomplice's prior conviction. Petitioner also takes issue with the trial court allowing the accomplice to testify about petitioner's rude conduct toward the accomplice and allowing a detective to testify about petitioner's negative reaction to being asked for a handwriting sample. However, petitioner fails to show that the state courts unreasonably applied federal law or determined the facts when they rejected these claims. Specifically, state courts reasonably concluded that even without the plea agreement, the jury knew that McFarland was receiving a deal for his testimony and that he had prior similar convictions. The record also reflects that the trial court declined to admit the "discovery documents" in light of concerns about relevance and potential confusion. Further, the state courts reasonably concluded that the rude conduct was relevant to the accomplice's motivation to testify against petitioner and that petitioner's reaction to being asked for a handwriting sample was admissible.

Petitioner also asserts that the prosecutor committed misconduct by referencing certain of petitioner's prior convictions in the opening statement and by failing to provide a longer version of a surveillance video that the prosecution used as evidence against petitioner. Again, the state courts reasonably rejected these claims where the opening statement was the sole reference to the prior convictions and where petitioner failed to provide anything more than speculation to support that the State had a version of the surveillance video that exculpated petitioner.

Finally, petitioner raises an issue regarding his sentencing that is not cognizable in a habeas proceeding because it is a matter of state law, and his claim of cumulative error lacks merit. Therefore, the petition should be denied, the action should be dismissed with prejudice,

no certificate of appealability should issue, and permission to proceed *in forma pauperis* should be revoked for the purpose of any appeal.

### BACKGROUND

Petitioner, who proceeds *pro se* and *in forma pauperis*, instituted this matter in federal court in January 2020. Dkt. 1. Petitioner then filed a separate case in this District challenging the same conviction. *See* Dkts. 36, 50. The petition in the separate case was docketed as the amended petition in this matter, and the Court ordered respondent to file an amended answer. Dkt. 51; *see also* Dkts. 52, 58, 62. Petitioner's response to the amended answer, however, incorporated arguments related to both his original and amended petitions. *See* Dkt. 62. Therefore, the Court ordered petitioner to file a second amended petition that included all of his grounds for relief and would operate as a complete substitute for his prior petitions in this matter. Dkt. 66, at 3.

Petitioner has now filed that second amended petition (Dkt. 67), in which he asserts that his conviction is invalid because (1) the prosecutor committed misconduct, (2) his trial and appellate counsel rendered ineffective assistance, (3) due process was violated, (4) an "incomparable" foreign conviction was used to increase his sentence, (5) improper character/other acts evidence was admitted, and (6) there was judicial bias, Dkt. 67, at 4, 7–8, 10–11. Respondent has filed a response to the operative petition (Dkt. 69), petitioner has filed a reply to the response (Dkt. 70), and the matter is ripe for decision.

Respondent has also filed portions of the state court record of proceedings, including the clerk's papers from the appellate court and verbatim reports of proceedings. *See* Dkt. 46; *see also* Dkt. 77 (supplemental submission of the state court record of proceedings). These documents set forth the following account of events in state court.

1        In February 2012, the Pierce County Superior Court sentenced petitioner to life without

2 the possibility of early release for his conviction of first-degree robbery stemming from events

3 that occurred on October 15, 2009.  Dkt. 46-1, at 2, 7.  Petitioner appealed, and Division Two of

4 the Washington State Court of Appeals affirmed in part but vacated petitioner's robbery

5 conviction and remanded for petitioner to be sentenced on first degree theft.  Dkt. 46-1, at 282;

6 *see also* Dkt. 46-1, at 430 (denying reconsideration).   The Supreme Court accepted review of

7 petitioner's conviction.  In June 2016, the Washington State Supreme Court, sitting en banc,

8 affirmed his conviction and sentence and reversed Division Two.  *See* Dkt. 46-1, at 26–27; *see*

9 *also* Dkt. 46-1, at 622 (denying reconsideration).

10        The Supreme Court summarized the facts of the matter as follows:

11                On October 15, 2009, [petitioner] Farnsworth and James McFarland were suffering heroin withdrawals and had no money to purchase more.  The pair made
12 a plan to "rob" a bank. . . .  The plan was for McFarland to wait outside in the car while Farnsworth entered a bank wearing a wig and sunglasses as a disguise, and
13 retrieve money.  Farnsworth would present the note to the teller, which read, "No die [sic] packs, no tracking devices, put the money in the bag.". . .

14                Farnsworth was "hem and hawing" while driving around, and McFarland grew increasingly frustrated with him, until he finally reached his breaking
15 point. . . .  He grabbed the wig and note from Farnsworth's hands and entered the bank to carry out their plan.  While Farnsworth waited outside in the ear, McFarland
16 approached a teller's counter, leaned through her window, and handed her the note.  The teller, Sarah Van Zuyt, testified that she instantly knew he was being robbed
17 when she read the note.  She said she was "scared" and "in shock.". . . Ms. Van Zuyt complied with the demand "[b]ecause I didn't want anybody else to get
18 harmed, and I didn't know what he was capable of doing.". . .  She handed him about $300 in small bills, and McFarland left.  Farnsworth and McFarland drove
19 away, but they were pulled over and arrested a few blocks from the bank.

20                Both Farnsworth and McFarland were charged with first degree robbery pursuant to RCW 9A.56.200(l)(b) (robbery committed in a financial institution).
21 Farnsworth faced the possibility of a life sentence under the Persistent Offender Accountability Act (POAA) of the Sentencing Reform Act of 1981 if convicted of
22 this robbery, as he was previously convicted of a 2004 robbery and a 1984 vehicular homicide in California. Ch. 9.94A RCW.  The POAA requires a life sentence when
23 a repeat offender commits a third felony that is classified as a "most serious offense" (often referred to as a "third strike").  RCW 9.94A.570, .030(33), (38).

24

REPORT AND RECOMMENDATION - 4

1    Likewise, McFarland faced a life sentence under the POAA, as he also had
prior convictions of crimes classified as most serious offenses.  He agreed to a plea

2 bargain for an 8- to 10-year sentence instead of a life sentence, whereby McFarland
would testify against Farnsworth in Farnsworth's jury trial for robbery.  McFarland

3 agreed to testify against Farnsworth after Farnsworth acted rudely toward
McFarland while staying at Western State Hospital following arrest. . . .

4    The jury was instructed on both first degree theft and first degree robbery;
it unanimously convicted Farnsworth of first degree robbery, and, per the jury

5 instructions, it did not consider the lesser-included crime of first degree theft.  The
trial court found that the conviction was his third strike under the POAA and

6 sentenced him to life in prison without the possibility of release.

7 Dkt. 46-1, at 28–29 (internal citations omitted).

8    The Supreme Court concluded that on these facts, there was sufficient evidence of a

9 threat of force during the crime and that petitioner was an accomplice and that petitioner had not

10 suffered cumulative error depriving him of a fair trial.  Dkt. 46-1, at 31, 38–39.  The Court

11 remanded the matter to Division Two to determine whether petitioner's prior conviction was

12 properly counted as a "strike" for sentencing purposes.  Dkt. 46-1, at 49.  On remand, Division

13 Two affirmed petitioner's sentence.  Dkt. 46-2, at 38; *see also* Dkt. 46-2, at 72 (denying

14 reconsideration).  The Supreme Court denied review of this opinion (Dkt. 46-2, at 116), and

15 Division Two's opinion became final on December 6, 2017.  Dkt. 46-2, at 118.

16    Petitioner sought relief from personal restraint by filing a personal restraint petition

17 ("PRP") in Division Two.  *See* Dkt. 46-3, at 282.  Petitioner subsequently filed another petition,

18 which was dismissed as a successive petition.  *See* Dkt. 46-4, at 22.  As for the first petition, the

19 Court of Appeals denied petitioner's request for relief (Dkt. 46-3, at 282), and petitioner sought

20 review in the Supreme Court.  On February 12, 2020, the Commissioner of the Supreme Court

21 issued a ruling denying review of the first petition.  Dkt. 46-3, at 330.  A certificate of finality

22 issued stating that Division Two's opinion became final on March 13, 2020.  Dkt. 46-3, at 359.

23

24

**DISCUSSION**

Respondent concedes that petitioner "appears to have properly exhausted his state court remedies" and proceeds directly to addressing petitioner's arguments on the merits.  Dkt. 69, at 6.  Therefore, the Court addresses the merits of petitioner's arguments.

The Court also observes that although the undersigned warned petitioner that he could not rely on other documents for the allegations in support of his habeas petition (*see* Dkt. 66, at 3) and has allowed petitioner to amend his petition to incorporate the entirety of his arguments, petitioner at points appears to attempt to incorporate other documents by reference as the basis for his petition.  *E.g.* Dkt. 67, at 94 (referring to petitioner's motion to dismiss counsel in the trial court).  The Court addresses solely the issues raised in petitioner's second amended habeas petition (Dkt. 67), the memorandum of law in support (Dkt. 68), the reply brief (Dkt. 70), and respondent's answer to the second amended petition (Dkt. 69).

**I. Legal Standard**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The first exception, § 2254(d)(1), allows habeas relief on the basis that an adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  The Supreme Court has ruled that a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result.  *Williams v. Taylor*, 529 U.S.

362, 405 (2000).  Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407.  In addition, a state court decision involves an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

The second § 2254 exception, § 2254(d)(2), provides for habeas relief if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Federal habeas courts must presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, review of state court decisions under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

## II.  Prosecutorial Misconduct

Petitioner raises a variety of claims that the prosecutor committed misconduct (*see* Dkt. 67, at 5), which are analyzed in turn.

Federal habeas review of such claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of

1  due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citation and quotation

2  marks omitted). Prosecutorial misconduct that rises to the level of a due process violation may

3  provide grounds for granting a habeas petition only if that misconduct had a "substantial and

4  injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104,

5  1113 (9th Cir. 2012) (internal citation and quotation marks omitted).

6  ### A.  McFarland's Plea Agreement

7  First, petitioner asserts that the prosecutor committed misconduct by eliciting and then

8  vouching for allegedly false testimony that McFarland gave regarding his plea agreement.

9  Petitioner argues that McFarland lied in his testimony, claiming that he had pleaded guilty to

10  only robbery, when he had in fact pleaded guilty to both robbery and theft. Dkt. 67, at 45.

11  At petitioner's trial, McFarland readily acknowledged that he was testifying against

12  petitioner pursuant to a plea bargain with the prosecutor and that the pending charges would

13  constitute McFarland's third strike, which he understood would result in a life without parole

14  sentence. Dkt. 46-4, at 1524. Based on his plea bargain, however, McFarland stated that he was

15  "looking at 8 to 10 years." Dkt. 46-4, at 1525.

16  McFarland's testimony indicated that he was not entirely clear regarding the details of his

17  plea agreement. *See* Dkt. 46-4, at 1611–12. Petitioner points to McFarland's testimony that he

18  believed he was going to be sentenced only with first-degree theft. Dkt. 46-4, at 1612. In fact,

19  McFarland pleaded guilty to both first-degree robbery and first-degree theft, contrary to his

20  testimony. *See* Dkt. 46-4, at 1612. Petitioner argues that the prosecutor committed misconduct

21  by failing to correct this testimony. *See* Dkt. 67, at 35.

22  On collateral review, petitioner raised this same argument, as well as a claim that the trial

23  court erred by refusing to admit the plea agreement. Dkt. 46-3, at 284, 331. Among other

24

things, the Supreme Court reasoned that petitioner could not show "actual[] and substantial[] prejudice[]" where on direct appeal, the Court had found that any error in excluding the plea agreement was harmless.  Dkt. 46-3, at 331.

It is well settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  To prevail on such a claim, a petitioner "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno–Arce*, 339 F.3d 886, 889 (9th Cir. 2003).  In assessing materiality, the question is whether there is "'any reasonable likelihood'" the false testimony or evidence could have "'affected the judgment of the jury.'"  *Hall v. Director of Corrections*, 343 F.3d 976, 983 (9th Cir. 2003) (citations omitted).  "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  *Id.* at 983–84 (citation omitted).

The Court observes that the record contradicts petitioner's claim that the jury "never heard" that McFarland was potentially facing a life without parole sentence, without admission of the plea agreement.  *See* Dkt. 67, at 34.  McFarland informed the jury that he believed his third strike would result in a life without parole sentence and that his plea bargain reduced the potential sentence to "8 to 10 years."  Dkt. 46-4, at 1524–25.  Contrary to petitioner's arguments, McFarland's testimony regarding his plea agreement did not leave the jury with the "impression that he had no incentive to testify other than truthfully."  Dkt. 67, at 46.  The overall point of

1    introducing evidence about the plea agreement was to develop a motive for McFarland to testify

2    falsely.  But it was clear, even without testimony about which crimes McFarland pleaded guilty

3    to, that McFarland was testifying because he sought the benefit of a bargain with the State, and

4    the exact details of the crimes he pleaded guilty to were collateral to this point.  And to the extent

5    that petitioner argues this "perjured" testimony was evidence that McFarland was an unreliable

6    witness, defense counsel was otherwise able to effectively cross examine McFarland about

7    inconsistencies in his story, including, notably that McFarland had claimed at one point not to

8    remember going into the bank at all and not to have used heroin on the day of the robbery.  *See*

9    Dkt. 46-4, at 1597, 1601.  Any error in McFarland giving false testimony that he had pleaded

10   guilty to only one crime, not two, was not a due process violation in light of these facts and

11   under the law set forth above.  The Supreme Court did not unreasonably apply clearly

12   established federal law or determine the facts in light of the evidence presented when it rejected

13   petitioner's argument on the basis that he failed to show actual and substantial prejudice.

14        Petitioner also appears to argue that the prosecutor violated *Brady v. Maryland* by failing

15   to disclose the plea agreement to the defense.  *See* Dkt. 68, at 8; *Brady v. Maryland*, 373 U.S. 83,

16   87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215 (1963) ("We now hold that the suppression by the

17   prosecution of evidence favorable to an accused upon request violates due process where the

18   evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

19   the prosecution.").  But the prosecutor did not suppress or withhold evidence from the defense;

20   rather, both parties took contrary positions on whether the plea agreement should be admitted as

21   evidence in the trial.  *Brady* did not require the prosecutor to abandon her role as the State's

22   advocate and concede to the admission of the plea agreement at petitioner's trial.

23

24

1    In short, petitioner fails to show that the state courts' rejection of his prosecutorial

2  misconduct arguments in this respect was contrary to or an unreasonable application of clearly

3  established federal law or unreasonable determinations of the facts.

4    **B.  McFarland Learning Petitioner Implicated McFarland**

5    Petitioner next argues that the prosecutor erred by failing to correct (and even vouching

6  for) McFarland's false testimony about another motive for McFarland to testify against

7  petitioner—that McFarland had allegedly reviewed discovery and learned that petitioner

8  inculpated McFarland in the robbery.  Dkt. 67, at 35–37, 54, 56.  Petitioner argues that the

9  prosecutor knew that there was no such discovery.  *See* Dkt. 67, at 35–37, 54, 56.

10   Petitioner refers to the following exchange on examination of McFarland:

11   Q [prosecutor].  []Now, when it comes to doing a crime with another person, is
     there kind of an understanding, as far as you're concerned anyway, in terms of if
12   you get caught how each of you are supposed to kind of handle yourself afterwards?
     A [McFarland].  Yes, there is. There's a code that you go by.
13   Q.  What's that?
     A.  You don't tell on nobody.  And if one of them is caught and the other one isn't,
14   that the one caught rides the beef.
     Q.  What does "ride the beef" mean?
15   A.  That means he takes the charges and cuts other guy out.
     . . . .
16   Q. . . .  Now, in this particular case, as it relates to that which happened immediately
     after your arrest, did you believe that Mr. Farnsworth violated that code?
17   A.  Yes, he did.
     Q.  How did he do that?
18   A.  Well, he wrote out a statement and some stuff.  I told the police I didn't want to
     talk to them or nothing; I wanted to see a lawyer.  He told me to talk to them.  He
19   started talking the minute he got in the police car.  He pointed the finger to me, after
     he cowered out on doing the robbery himself three different times before I went in
20   there.  And then --
     Q.  And then -- okay.  *That's what happened* -- I mean, let me ask you this.  How
21   is it that you ultimately learned that he had done that?  That he had made those
     statements after he was arrested.
22   A.  When I read that I seen the stuff in the paperwork and so forth.  He didn't tell
     me that he had done that.
23   Q.  Okay.  And when you mean "paperwork," can you tell us what you mean.

24

1    A.  I'm talking about the discovery.  You can get what they call the discovery.  It
2    has all of the police reports in it, all the witnesses['] statements.  Everything that's
     going to be used in trial and so forth is in the discovery.

3  Dkt. 46-4, at 1525–26 (emphasis added); *see also* Dkt. 77-1, at 824 (McFarland's testimony on

4  redirect).  Petitioner takes particular issues with the prosecutor's statement "[t]hat's what

5  happened," which petitioner asserts amounted to vouching for McFarland's veracity.

6        The Supreme Court Commissioner addressed these arguments on collateral review,

7  ruling,

8            Mr. Farnsworth next contends that the prosecutor presented knowingly false
9        testimony when she elicited from Mr. McFarland that he decided to testify against
         Mr. Farnsworth when he read a handwritten statement and police reports in which
10       Mr. Farnsworth implicated him.  Mr. Farnsworth asserts that these documents did
         not exist and that the State failed to present them as evidence.  Further, he contends
11       that he tried to introduce them to impeach Mr. McFarland, but the trial court refused
         to admit them on the basis of hearsay.  He urges that defense counsel was ineffective
12       in not arguing that the State had opened the door to admission of the documents.  It
         is not clear how the documents could simultaneously not exist and be erroneously
13       excluded.  But in any event, Mr. Farnsworth demonstrates no actual and substantial
         prejudice nor a complete miscarriage of justice in relation to this matter.

14  Dkt. 46-3, at 332.

15        A claim of elicitation of perjured testimony requires a showing of some factual basis that

16  there was a "knowing presentation of perjury[] by the government."  *Morales v. Woodford*, 388

17  F.3d 1159, 1179 (9th Cir. 2004).  But the record does not support petitioner's version of the

18  facts.  For instance, outside the jury's presence, the prosecutor stated that petitioner's trial

19  counsel had "a copy of the police report that contains the information that you [defense counsel]

20  just represented to the court that does not exist.  You're looking at the wrong police reports."

21  Dkt. 77-1, at 848.  Later, the prosecutor stated, ". . . you're standing here representing to the

22  court the information that this witness just testified to doesn't exist.  And that's not accurate.

23  You've got the wrong reports."  Dkt. 77-1, at 849.  Thus, the record contradicts petitioner's

24

1  characterization that the prosecutor knowingly suborned perjured testimony, and petitioner fails

2  to show that the state courts unreasonably applied federal law when rejecting his prosecutorial

3  misconduct claim in this regard.

4        The Court also disagrees with petitioner's characterization of the prosecutor's "that's

5  what happened" statement as vouching.  "'Vouching consists of placing the prestige of the

6  government behind a witness through personal assurances of the witness's veracity, or

7  suggesting that information not presented to the jury supports the witness's testimony.'"  *United*

8  *States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (quoting *United States v.*

9  *Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993)).  The Court does not agree that the isolated

10  statement "[t]hat's what happened" constituted impermissible vouching—that is, the prosecutor's

11  personal endorsement of McFarland's credibility—particularly in light of the prosecutor's

12  immediate clarification that she was, in fact, asking McFarland how he knew that happened.

13  Petitioner also cites an instance when the prosecutor's statement occurred outside the presence of

14  the jury.  *See* Dkt. 46-4, at 1145, 1443.  Argument outside the jury's presence, was not

15  impermissible "vouching" and did not prejudice petitioner.

16        Petitioner fails to show that the state court unreasonably applied clearly established

17  federal law or unreasonably determined the facts when it rejected his prosecutorial misconduct

18  claims related to the plea agreement.  In addition, he fails to show that the prosecutor violated

19  *Brady* (as he briefly argues), where he does not show that there was exculpatory evidence of

20  which the prosecutor should have been aware and that she withheld.  *See* Dkt. 68, at 8.

21        **C.  Petitioner's Prior Crimes**

22        Petitioner next takes issue with the prosecutor's characterization of certain prior crimes.

23  Specifically, petitioner refers to a part of the prosecutor's opening statement in which she

24

1  asserted that Farnsworth committed two robberies in 2004, wearing a wig both times and

2  "glasses" one time. Dkt. 46-4, at 804. The prosecutor also noted that McFarland had worn a

3  lady's wig and sunglasses to rob the credit union in 2009—so that the evidence about petitioner

4  tended to inculpate him as the mastermind of the 2009 robbery. *See* Dkt. 46-4, at 802. At trial,

5  although the State submitted evidence that McFarland wore a wig and "female sunglasses" (Dkt.

6  46-4, at 1130) to commit the robbery, the State did not refer to petitioner or any other person

7  having otherwise worn glasses or a wig during a prior crime or crimes, after the opening

8  statement.

9        On direct appeal, petitioner asserted that the prosecutor improperly argued before the jury

10  that petitioner had used a wig and sunglasses in two prior robberies. Dkt. 46-1, at 297. Division

11  Two disagreed, observing that the trial court found by a preponderance of the evidence that

12  petitioner had previously committed two robberies while wearing a wig and sunglasses (Dkt. 46-

13  1, at 297) and that petitioner had failed to claim that the prosecutor acted in bad faith when

14  making such an argument in the opening statement. Dkt. 46-1, at 298. The Supreme Court also

15  addressed this issue, agreeing that the prosecutor acted in good faith by commenting on

16  petitioner's prior robbery convictions while wearing a wig in her opening statement but

17  ultimately abandoning the strategy of eliciting evidence of the prior robberies. *See* Dkt. 46-1, at

18  45.

19        Petitioner raised related issues again on collateral review. *See* Dkt. 46-3, at 284. In the

20  ruling denying review, the Supreme Court Commissioner explained—

21        . . . the State presented no evidence of those convictions. It mentioned them in its
       opening statement but ultimately decided to not present evidence of them. Again,

22       this court addressed this matter on direct appeal and found no error in the State
       mentioning the prior robberies in opening but later deciding against presenting

23       evidence of them. . . . As with his previous issue, Mr. Farnsworth offers no reason

24

1          in the interests of justice to reexamine this issue in the context of a claim of
2          prosecutorial misconduct.

3    Dkt. 46-3, at 331–32.

4          Comments made during an opening or closing statements may be so prejudicial as to

5    support a finding of constitutional error. *Frazier v. Cupp*, 394 U.S. 731, 736 (1969).  However,

6    there is no error if the prosecutor during an opening statement gave an "objective summary of

7    evidence which the prosecutor reasonably expect[s] to produce," even if events at trial prevented

8    the prosecutor from actually presenting that evidence.  *Id.*  Here, the trial court instructed the jury

9    that the attorneys' statements were not evidence or the law.  Dkt. 46-4, at 712; *see also* Dkt. 46-

10   3, at 44 (citing the jury instructions' statement "that the lawyers' statements are not evidence.").

11   The Supreme Court rejected a claim that the prosecutor committed misconduct during the

12   opening statement in *Frazier*, where the prosecutor included a summary of a witness's testimony

13   in the opening statement and the witness later refused to testify.  394 U.S. at 733–34.  There, as

14   here, the record supported that the prosecutor reasonably expected to present the evidence and a

15   limiting instruction was given.  *Id.* at 734–36.  In light of *Frazier*, petitioner fails to show that the

16   state courts unreasonably applied the law or determined the facts when rejecting his claim of

17   prosecutorial misconduct in this regard.

18         Petitioner also takes issue with the prosecutor's characterization of petitioner's

19   appearance during the 2004 robberies.  *See* Dkt. 67, at 38.  Petitioner argues that the prosecutor

20   mischaracterized the evidence related to these robberies when arguing for evidence of them to be

21   admitted at the trial regarding the 2009 robberies.  *See* Dkt. 67, at 38.  But the record controverts

22   petitioner's argument that the prosecutor misstated that "glasses" had been used in both 2004

23   robberies—the prosecutor stated that in "at least *one* of them he also wore glasses."  Dkt. 46-4, at

24   804 (emphasis added).

1    Petitioner also argues that the prosecutor's statement that petitioner was wearing glasses

2  during one of the 2004 robberies constituted misconduct because the prosecutor flouted a pretrial

3  ruling requiring the prosecutor to describe the glasses worn in 2004 as reading glasses. *See* Dkt.

4  67, at 38. But, contrary to petitioner's claims, the prosecutor did not say that petitioner was

5  wearing "sunglasses" during opening argument. Rather, the prosecutor argued that the State

6  would put on evidence that the robber was wearing "glasses" and acknowledged "a debate as to

7  whether or not they were merely reading glasses" or were "part of [a] facial disguise." Dkt. 46-

8  4, at 804.

9    Moreover, although petitioner makes much of the prosecutor's alleged

10 mischaracterization of the circumstances of the prior robberies when arguing for the admission

11 of the evidence of his prior crimes, except as otherwise noted, this evidence was not submitted to

12 the jury. Petitioner cannot, therefore, show that even if there were misconduct in this regard, it

13 had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 693

14 F.3d at 1113. Nor can he show that the state court unreasonably applied clearly established

15 federal law or unreasonably determined the facts when it rejected his prosecutorial misconduct

16 claims in this regard.

17              **D. Home Depot Surveillance Video**

18    Petitioner next argues that the prosecution failed to provide a complete copy of a

19 surveillance video excerpt from the parking lot of a Home Depot store near the scene, instead

20 deleting allegedly exculpatory portions of the video excerpt. *See* Dkt. 67, at 42. Petitioner

21 claims that the prosecution violated *Brady* and Washington Criminal Rule 4.7 by failing to

22 promptly release the video footage to the defense until 22 days after Home Depot's known

23 destruction date of the original, complete video. Dkt. 67, at 71; Dkt. 68, at 36, 43. Petitioner

24

1    alleges prosecutorial misconduct because the prosecutor should have promptly disclosed the

2    video evidence.  Dkt. 67, at 84–85.  However, petitioner fails to establish that the state courts

3    unreasonably determined that petitioner had provided nothing more than speculation to support

4    that police ever had copies of the video footage that contained exculpatory evidence.

5         The video footage in question shows a man (presumably McFarland) running from the

6    bank into a truck that pulled up to meet him (driven by petitioner, according to the State's theory

7    of the case at trial) and the truck speeding away.  *See* Dkt. 46-3, at 150–51 (police report

8    describing the video).  According to a police report, police copied the footage from a Home

9    Depot security system on October 15, 2009, and were advised that Home Depot would destroy

10   the original recordings within 90 days.  Dkt. 46-3, at 151.  The report from when the footage was

11   collected states that the footage included "three separate camera angles of the possible suspects"

12   although "[m]ost of the footage . . . was from a distance and did not initially appear to provide

13   specific details."  Dkt. 46-3, at 150.  The record also includes the State's November 4, 2009,

14   discovery receipt stating that the surveillance video would be provided upon receipt of blank

15   CDs (Dkt. 46-2, at 210), and petitioner's former counsel's request January 26, 2010 for an

16   unedited version of the footage from at least one hour before the robbery.  Dkt. 46-2, at 208.

17        Petitioner alleges that there is a missing portion of the video that would show the arrival

18   and path of the truck containing McFarland and petitioner and would "corroborate[] statements

19   made by petitioner to Detective Griffith on the day of the robbery."  Dkt. 67, at 71.  Petitioner

20   essentially asserts that the missing footage would have shown McFarland ostensibly going to

21   purchase heroin from a third person while petitioner waited in the car, parked by the bank.  *See*

22   Dkt. 46-2, at 239–40; Dkt. 67, at 81.

23

24

1    On collateral review of petitioner's first personal restraint petition, the Supreme Court

2    commissioner rejected petitioner's arguments related to the surveillance video.  Dkt. 46-3, at

3    333.  The Commissioner ruled that petitioner had failed to show that "videos supplied by the

4    store ever depicted what he claims was missing" or that the trial court erred when it denied

5    petitioner's motion to dismiss the charges against him on the basis of governmental misconduct.

6    Dkt. 46-3, at 333.  Petitioner also raised this issue as a claim of prosecutorial misconduct in his

7    second personal restraint petition, and the Supreme Court commissioner again rejected it.  Dkt.

8    46-4, at 23.  The Commissioner explained that petitioner failed to make a threshold factual

9    showing that his allegations related to the video evidence were based on more than speculation:

10    "[h]is assertions about the alleged missing video evidence are speculative."  Dkt. 46-4, at 23.

11    To succeed on a *Brady* claim, the petitioner must show the evidence was favorable to the

12    defense, the prosecution possessed and suppressed the evidence, and the defendant was

13    prejudiced.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Speculation is not sufficient to

14    show a violation.  *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).  Moreover, to prevail on a claim

15    that the State failed to preserve potentially useful evidence, petitioner must show that police

16    acted in bad faith.  *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).  The presence of bad faith

17    necessarily turns on whether the officials knew of the exculpatory value of the evidence at the

18    time of destruction.  *Youngblood*, 488 U.S. at 56.

19    At the outset, the Court observes that the record reflects the prosecution made the defense

20    aware of the existence of the surveillance video as early as November 2009—when the discovery

21    distribution receipt reflects that defense counsel Matt Renda was informed that he would be

22    given CDs of the surveillance video if he provided blank CDs to the prosecutor's office.  *See*

23    Dkt. 46-2, at 210.  This was within one month of police collecting the surveillance footage from

24

1   Home Depot and being told that it would be destroyed in 90 days.  *See* Dkt. 46-3, at 150–51.

2   The police report states that police did not find other video footage than that collected to provide

3   "specific details," which is contrary to petitioner's arguments that the prosecution edited the full

4   video footage to remove exculpatory evidence.

5          Moreover, regarding petitioner's arguments that police must have acted in bad faith and

6   deleted exculpatory portions of the video, petitioner fails to show that the state courts

7   unreasonably characterized the facts when they determined that his arguments relied on

8   speculation.  Petitioner does not point to evidence to support that the surveillance cameras

9   captured any footage tending to exculpate him.  *See* Dkt. 67, at 70–71.  Petitioner's argument

10  that the video footage must have captured his version of events because the events allegedly

11  occurred and because the footage does not depict the time that the truck arrived is not sufficient.

12  And the obligation to disclose favorable evidence under *Brady* does not apply to "preliminary,

13  challenged, or speculative information."  *United States v. Agurs*, 427 U.S. 97, 109 n.16

14  (1976) (citation omitted).  Therefore, petitioner fails to show that the state court unreasonably

15  determined the facts or applied clearly established law to his claims.

16                          **E.  Rude Conduct at Western State Hospital**

17         Petitioner appears to argue that the prosecutor committed misconduct by improperly

18  arguing for the admission of evidence of petitioner's rude conduct toward McFarland while both

19  were held at Western State Hospital pending trial.  Dkt. 67, at 86–88.  However, the Washington

20  state courts held that evidence of this rude conduct was admissible to explain why McFarland

21  would testify against petitioner.  *See* Dkt. 46-1, at 46.  This is an issue of state law and is

22  therefore not cognizable as a basis for federal habeas relief.  *See, e.g.*, *Lewis v. Jeffers*, 497 U.S.

23  764 (1990); *accord Embry v. Sinclair*, No. 314CV05360BHSTLF, 2020 WL 9748986, at *12

24

(W.D. Wash. Dec. 29, 2020), *report and recommendation adopted*, No. C14-5360 BHS, 2021 WL 2105299 (W.D. Wash. May 25, 2021) ("Despite [petitioner's] claim that the trial court's failure to limit the introduction of ER 404(b) evidence violated his right to a fair trial, the claim, in fact, implicates only state law concerns."). Moreover, the prosecutor did not commit misconduct by advocating for her client, where she sought admission of evidence that the state courts agreed was admissible. Petitioner fails to show a constitutional violation in this regard.

### F. Handwriting Exemplar

Petitioner argues that the prosecutor committed misconduct by eliciting communications that went beyond a trial-court sanctioned inquiry into petitioner's refusal to comply with a court order. Dkt. 67, at 90. Petitioner asserts that the State improperly commented on his assertion of his right to remain silent by eliciting testimony that allowed the State to argue in closing that petitioner acted guilty when a detective sought to collect a handwriting sample. Dkt. 67, at 93. Petitioner also appears to argue that the State misrepresented the evidence by arguing that petitioner refused to comply, when petitioner in fact refused to comply without his standby counsel present. Dkt. 67, at 110.

At petitioner's trial, a detective testified that pursuant to a court order, the detective had attempted to collect a handwriting exemplar from petitioner while petitioner was incarcerated. Dkt. 46-4, at 1344. As soon as petitioner had seen the detective, petitioner had "started to shout that he didn't want to talk to" the detective, giving reasons including that petitioner did not feel that he had received all of the case documents. Dkt. 46-4, at 1344–45. The detective was allowed to testify that petitioner refused to comply with the court order by providing an exemplar and that he had an angry and uncooperative demeanor. *See* Dkt. 46-4, at 1345.

On direct appeal, Division Two rejected petitioner's claim that his right to remain silent was violated by this testimony, explaining that petitioner had failed to object on the ground that the detective's testimony went beyond his mere act of refusal to comply and that petitioner failed to explain how his right to remain silent was violated.  Dkt. 46-1, at 299.  The Supreme Court also addressed this issue, concluding that petitioner had failed to show "manifest" error affecting a constitutional right that would justify review because—

> McFarland's detailed testimony implicating Farnsworth had a much greater impact than the detective's testimony that Farnsworth was angry about providing a handwriting sample.  Therefore, given what the trial court knew at the time, it would not reasonably conclude that admitting the detective's testimony would have identifiable consequences as to the outcome of Farnsworth's trial.  Therefore, this is not a manifest error that would warrant our review despite Farnsworth's failure to raise this issue at trial.

Dkt. 46-1, at 47–48.

On collateral review, the Supreme Court commissioner also rejected these claims, ruling that petitioner "cite[d] no authority for the notion that evidence of his refusal to comply with an order to provide a handwriting sample itself constitutes an impermissible comment on his right to remain silent" and that petitioner "does not show the State used statements rela[y]ed by the detective for the purposed of suggesting that silence, rather than refusing to provide a handwriting sample, indicated his guilt."  Dkt. 46-3, at 333.

A prosecutor may not argue that a petitioner is guilty based upon his silence pursuant to his invocation of his right to remain silent.  *See Griffin v. California*, 380 U.S. 609, 615 (1965).  But that is not what occurred in this matter.

During closing argument, the prosecutor drew the jury's attention to petitioner's refusal to comply with the court order, noting that petitioner "absolutely refused to" comply with the order.  Dkt. 77-1, at 1036.  Instead, he became "very agitated, very loud" and "had to be

1    instructed to sit down." Dkt. 77-1, at 1036.  According to the prosecutor, this showed that

2    petitioner was "afraid and nervous" because he knew that the sample would implicate him.  Dkt.

3    77-1, at 1036.  The prosecutor never commented that petitioner's silence implicated him.  In fact,

4    the prosecutor argued the opposite.

5          Petitioner was not silent.  He responded loudly and angrily.  Therefore, the prosecutor

6    was commenting on what petitioner said, not on what he did not say—namely, that petitioner's

7    loud and absolute refusal to comply was evidence of his guilt.

8          Even if the prosecutor's comments did somehow implicate petitioner's right to remain

9    silent, such is subject to harmless error analysis.  *E.g.*, *United States. v. Hasting*, 461 U.S. 499,

10   511 (1983).  The Ninth Circuit instructs that "prosecutorial comments on failure to testify only

11   require reversal 'where such comment is extensive, where an inference of guilt from silence is

12   stressed to the jury as a basis for the conviction, and where there is evidence that could have

13   supported acquittal.'"  *Beardslee v. Woodford*, 358 F.3d 560, 587 (9th Cir.), *supplemented sub*

14   *nom. Beardslee v. Brown*, 393 F.3d 1032 (9th Cir. 2004) (quoting *Lincoln v. Sunn*, 807 F.2d 805,

15   809 (9th Cir. 1987)).  As the state Supreme Court explained, the effect of highlighting

16   petitioner's reaction to being asked for a handwriting sample was far less damaging than

17   McFarland's detailed testimony implicating petitioner—and the fact that ultimately, police

18   determined that petitioner's handwriting matched the note used in the robbery.  Petitioner fails,

19   therefore, to show that the state courts unreasonably applied federal law to his claims when they

20   determined that he had not shown a Fifth Amendment violation or prosecutorial misconduct.

21   Even if he could do so, the error was harmless.

22         Petitioner also briefly argues that the prosecutor's closing argument that petitioner had

23   "absolutely refused" to comply with the court order to provide a handwriting sample went

24

beyond the evidence introduced at trial (*see* Dkt. 67, at 110). Even assuming that this claim was

exhausted in the state courts, it lacks merit. A prosecutor's closing argument may not go beyond

reasonable inferences from the evidence produced at trial. *E.g.*, *United States v. Younger*, 398

F.3d 1179, 1190 (9th Cir. 2005). However, the prosecutor's argument was a reasonable

inference from the detective's testimony that petitioner refused to comply with the court order,

citing numerous alternative reasons, including that counsel was not present. See Dkt. 46-4, at

1345–46, 1361–62. Even if the argument were improper, for the reasons discussed above, the

brief reference to petitioner's refusal to submit a handwriting sample was harmless. *See United*

*States v. Toomey*, 764 F.2d 678, 681 (9th Cir. 1985).

### III. Ineffective Assistance of Counsel

#### A. Legal Principles

To prevail on a claim that counsel rendered ineffective assistance, a petitioner must show

both that "counsel's performance was deficient" and that "the deficient performance prejudiced

the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, a

defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694.

Moreover, when reviewing a habeas claim that counsel rendered ineffective assistance,

the Supreme Court has explained—

> the pivotal question is whether the state court's application of the *Strickland*
> standard was unreasonable. This is different from asking whether defense
> counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court were adjudicating a
> *Strickland* claim on direct review of a criminal conviction in a United States district
> court. Under AEDPA, though, it is a necessary premise that the two questions are
> different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal
> law is different from an *incorrect* application of federal law." [Internal citation
> omitted.] A state court must be granted a deference and latitude that are not in
> operation when the case involves review under the *Strickland* standard itself.

1

> A state court's determination that a claim lacks merit precludes federal
> habeas relief so long as "fairminded jurists could disagree" on the correctness of
> the state court's decision.  [Internal citation omitted.]

2

3    *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

4                    **B.  Failure to Seek Admission of Discovery Documents**

5    Petitioner argues that his trial counsel should have argued for the admission of "discovery

6    materials" that McFarland claimed to have reviewed as the basis for his belief that petitioner had

7    implicated McFarland.  *See* Dkt. 67, at 55 n.1.  He also argues that appellate counsel rendered

8    ineffective assistance by failing to raise the issue on appeal.  Dkt. 67, at 55 n.1.

9    Plaintiff's trial counsel sought to have police reports admitted during McFarland's

10   testimony in order to impeach McFarland with the contents of those reports—specifically, by

11   showing that the reports did not include petitioner implicating McFarland, as McFarland

12   claimed.  *See* Dkt. 77-1, at 797.  However, the trial court denied the request, finding that the

13   police reports would not show any true inconsistency, where McFarland was uncertain of the

14   place where he saw the information.  *See* Dkt. 77-1, at 799–800.  Later, defense counsel renewed

15   his arguments, but the trial court explained that it would not allow impeachment in this manner

16   due to the volume of material implicated.  Dkt. 77-1, at 849.

17   On collateral review, the State supreme court commissioner rejected petitioner's

18   argument that his counsel should have argued that the State "opened the door" to admission of

19   the discovery documents.  The Commissioner concluded that petitioner "demonstrate[d] no

20   actual and substantial prejudice nor a complete miscarriage of justice in relation to this matter."

21   Dkt. 46-3, at 332.

22   The record shows that the trial court had concerns about the relevance of and potential for

23   confusion caused by admission of the discovery documents.  Where a party "opens the door" to a

24

1    subject on direct or cross-examination, generally, the rules will permit cross-examination or

2    redirect examination within the scope of the examination in which the subject was introduced.

3    *State v. Gefeller*, 76 Wn.2d 449, 455 (1969).  Even if the door is opened by one party, however, a

4    trial court may disallow evidence that is not relevant or for which the probative value of the

5    evidence is substantially outweighed by the danger of confusion of the issues.  *See* Washington

6    Rules of Evidence 402, 403.  Petitioner's trial counsel did not render ineffective assistance by

7    failing to press an argument that was unlikely to succeed.  And his appellate counsel did not

8    render deficient performance by not raising this issue, either.  Petitioner's arguments fail to show

9    that the state court erred in rejecting his claim in this regard or that his appellate counsel

10    rendered deficient performance by failing to raise it on direct appeal.

11    ### C.  Actions related to Surveillance Footage and Potential Witnesses

12    Petitioner argues that his trial counsel failed to obtain copies of police department or

13    prosecutorial policy to help him argue his claims related to the surveillance video footage and

14    that standby counsel failed to obtain the allegedly missing footage.  Dkt. 67, at 74, 96; Dkt. 68, at

15    21, 47.  On collateral review, the state supreme court commissioner found that petitioner had

16    failed to show that the surveillance videos provided by the store ever depicted what petitioner

17    claimed was missing.  Dkt. 46-3, at 333.  As noted above, the state courts reasonably rejected

18    petitioner's arguments that exculpable video evidence existed where petitioner relied entirely

19    upon speculation to support his claims in the state courts.  Further, petitioner's counsel Matt

20    Renda did, in fact, request the unedited surveillance video.  Dkt. 46-2, at 208.

21    Petitioner argues that trial counsel also rendered ineffective assistance by failing to

22    interview potential defense witnesses.  Dkt. 67, at 100; Dkt. 68, at 21.  But on collateral review,

23    the State supreme court commissioner explained that petitioner had failed to provide any

24

1    evidence that those witnesses could have provided admissible, exculpatory evidence.  Dkt. 46-3,

2    at 333.  Petitioner points to the same investigation reports and his same declaration that he

3    provided in support of his personal restraint petition making these arguments (Dkt. 46-2, at 217,

4    258, 262–63, 265–67, 269, 271, 273), but he fails to make any argument explaining how the

5    commissioner's ruling was an unreasonable determination of the facts in light of the evidence

6    presented.

7                          **D.  Standby Counsel**

8            Petitioner makes a number of arguments related to his standby counsel (Dana Ryan and

9    Stephen Johnson).  But there is no recognized cause of action against standby counsel for

10   ineffective assistance, where a defendant proceeds *pro se*.  *See United States v. Cochrane*, 985

11   F.2d 1027, 1029 (9th Cir. 1993) ("[A] defendant who elects to represent himself cannot

12   thereafter complain that the quality of his own defense amounted to a denial of 'effective

13   assistance of counsel.'" (quoting *Faretta v. California*, 422 U.S. 806, 834–35 n.46 (1975))).

14   Although in *Cochrane*, the Ninth Circuit noted that it had no occasion to decide whether such a

15   claim might exist if a *pro se* defendant actually used and relied on standby counsel's assistance

16   (*id.* at 1029 n.1.), neither the Ninth Circuit nor the Supreme Court has since held that a claim of

17   ineffective assistance of counsel might exist where a defendant is *pro se* and relies on the

18   assistance of standby counsel.  Petitioner fails to show that the state courts' rejection of his

19   claims of ineffective assistance of standby counsel amounted to an unreasonable application of

20   any clearly established federal law.  *Accord Layton v. Martel*, No. ED CV 10-1534-VAP SP,

21   2014 WL 773450, at *29 (C.D. Cal. Feb. 20, 2014).

22                          **E.  Matters Already Addressed**

23

24

Petitioner additionally argues that his trial counsel rendered ineffective assistance by failing to object when the prosecutor falsely represented petitioner's prior convictions—that is, when the prosecutor, during the opening statement, referred to petitioner having used a wig and/or glasses during a prior robbery.  Dkt. 67, at 69; Dkt. 68, at 22–23.  And he argues that his appellate counsel rendered ineffective assistance by failing to raise the issue. Dkt. 68, at 22.

As noted above, however, petitioner's prosecutorial misconduct argument in this regard fails.  *Supra* Part II(C).  The state courts did not unreasonably apply federal law when they rejected the prosecutorial misconduct claim and when they concluded that petitioner's related ineffective assistance of counsel claim also failed.  *See* Dkt. 46-3, at 285, 332.  Similarly, petitioner fails to show that his appellate counsel rendered ineffective assistance by not raising this argument.

Petitioner also argues that his trial counsel rendered ineffective assistance by failing to object when the prosecutor allegedly violated petitioner's right to remain silent by eliciting a detective's testimony regarding petitioner's reaction to being asked for a sample of his handwriting.  *See* Dkt. 67, at 90; Dkt. 68, at 23.  As discussed already, the Court finds that the state courts did not unreasonably apply federal law when they held that the prosecutor had not committed misconduct in this regard and had not implicated petitioner's right to remain silent. The state courts also did not unreasonably apply federal law when they concluded that petitioner failed to show ineffective assistance of counsel on the basis of this argument.  *See* Dkt. 46-3, at 333.

Petitioner argues that his trial and appellate counsel failed to raise the issue of McFarland's plea agreement based on McFarland giving allegedly perjured testimony regarding that plea agreement.  Dkt. 68, at 22.  But, the state courts addressed these issues and explained

1  that these arguments failed where petitioner's trial counsel had attempted to impeach McFarland

2  with the plea agreement.  *See* Dkt. 46-3, at 284, 332.  Petitioner fails to show that the rejection of

3  his arguments was an unreasonable application of clearly established federal law or unreasonable

4  determination of the facts.  He also fails to show that his appellate counsel's performance was

5  defective for not raising the issue, where there was no reasonable likelihood of success in making

6  such an argument.

7  **IV.  Judicial Bias and Rights to a Fair Trial, of Confrontation, and to a Defense**

8       Petitioner appears to allege that a number of the trial court's rulings evince judicial bias

9  because the trial court ruled in the State's favor.  And, he claims that his constitutional rights—

10  such as the right to present a defense, of confrontation, and to a fair trial—were violated by

11  various evidentiary rulings.  His arguments are address in detail below.

12       To succeed on a judicial bias claim, petitioner must "overcome a presumption of honesty

13  and integrity in those serving as adjudicators."  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

14  On habeas corpus review of a state conviction, judicial misconduct will warrant habeas relief

15  only where "the state trial judge's behavior rendered the trial so fundamentally unfair as to

16  violate federal due process under the United States Constitution."  *Duckett v. Godinez*, 67 F.3d

17  734, 740 (9th Cir. 1995).  Petitioner references judicial rulings with which he disagrees, but a

18  judicial ruling "almost never" can demonstrate judicial bias.  *Liteky v. United States*, 510 U.S.

19  540, 555 (1994).  Moreover, "federal habeas corpus relief does not lie for errors

20  of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  It "is not the province of a

21  federal habeas court to reexamine state-court determinations on state-law questions."  *Id.* at 67–

22  68.

23

24

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a defense and to present relevant evidence in their own defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)). This right is not unlimited, but rather, is subject to reasonable restrictions. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). However, the United States Supreme Court has held that the introduction of even relevant evidence can be limited by a State for a valid reason. *Montana v. Egelhoff*, 518 U.S. 37, 51–53 (1996).

A state evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308; *Crane*, 476 U.S. at 689–91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"). The Supreme Court has found a violation of the right to present a complete defense in cases where a state evidentiary rule, on its face, "significantly undermined fundamental elements of the defendant's defense," but did little or nothing to promote a legitimate state interest. *Scheffer*, 523 U.S. at 315; *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

### A.  Ruling Regarding McFarland's Prior Conviction for Theft

At his trial, petitioner sought to impeach McFarland using evidence including McFarland's prior theft conviction, but the trial court denied the request. Dkt. 46-1, at 295; *see* Dkt. 46-4, at 1431. Petitioner alleges that this ruling evinced judicial bias and violated his right of confrontation and to a fair trial. *See* Dkt. 67, at 47; Dkt. 68, at 9.

1      On appeal, the Court of Appeals addressed this issue and agreed with petitioner that the

2  trial court had clearly erred in applying state rules of evidence. Dkt. 46-1, at 295. However, the

3  Court found that petitioner failed to show that this error deprived him of a fair trial, materially

4  affected the trial's outcome, or was anything more than harmless. *See* Dkt. 46-1, at 300–01. The

5  Court of Appeals pointed out that McFarland had testified that he "hustl[ed]" to support his

6  heroin addiction, including committing various crimes—such as theft—and that McFarland had

7  previously been convicted of first degree burglary and first degree robbery. Dkt. 46-1, at 301.

8  The Supreme Court did not address this matter on direct appeal, but this Court may "look

9  through" to Division Two's holding. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

10     Petitioner's assertions that the trial court committed legal error are insufficient to

11  establish judicial bias or misconduct. *See Liteky*, 510 U.S. at 555–56. "[J]udicial rulings, routine

12  trial administration efforts, and ordinary admonishments (whether or not legally supportable) to

13  counsel and to witnesses" do not evince judicial bias "that would render fair judgment

14  impossible." *Id.* at 556. Petitioner fails to point to anything in the record other than the legal

15  error as support for his claim that the judge was biased against him. Therefore, his judicial bias

16  claim fails.

17     Moreover, petitioner fails to show that the state court unreasonably determined the facts

18  when it concluded that McFarland otherwise testified to having committed similar crimes, so that

19  the error was harmless. *See* Dkt. 46-1, at 300–01. To the extent that he argues that the

20  evidentiary error amounted to judicial bias, he therefore cannot show that the error "rendered the

21  trial so fundamentally unfair as to violate federal due process under the United States

22  Constitution." *Duckett*, 67 F.3d at 740. For similar reasons, petitioner's arguments that the

23  ruling violated his rights to a fair trial and to confront the witnesses against him fail. *See Davis*

24

1   *v. Ayala*, 576 U.S. 257, 267 (2015) (explaining that constitutional claims in habeas petitions

2   require a showing of "actual prejudice").

3       Finally, the Court briefly notes that petitioner asserts an undeveloped claim that the

4   prosecutor suppressed McFarland's prior conviction in violation of *Brady*. *See* Dkt. 68, at 8.

5   But petitioner fails to make a colorable claim of a *Brady* violation where the prosecutor readily

6   acknowledged the existence of the prior conviction but acted within her role as the State's

7   advocate to litigate its admissibility.

8                           **B. McFarland Guilty Plea**

9       Petitioner next takes issue with the trial court's ruling denying admission of the guilty

10  plea, arguing that the court's ruling evinced judicial bias and that it violated his right of

11  confrontation. Dkt. 67, at 46, 51; Dkt. 68, at 9.

12      As previously discussed, the Court finds that the state courts reasonably concluded that

13  McFarland's alleged misstatement of the terms of his plea deal was harmless where the jury

14  nevertheless heard that McFarland was obtaining a significantly reduced sentence in return for

15  his testimony against petitioner. The trial court denied petitioner's trial counsel's request to

16  admit McFarland's guilty plea to impeach McFarland and sustained the prosecution's objections

17  that the plea agreement as confusing, misleading, and irrelevant. *See* Dkt. 77-1, at 806.

18      On direct appeal, the Supreme Court explained that the plea agreement was properly

19  excluded because it added no new information that the jury did not already know (i.e. that

20  McFarland had a motive to testify against petitioner) and because there was extrinsic information

21  in the plea agreement that had the potential to confuse the jury. Dkt. 46-1, at 41–42. Moreover,

22  any error was harmless under even the standard for constitutional errors because the plea

23  agreement would be "merely cumulative of other evidence presented." Dkt. 46-1, at 43 n.18 &

24

44.  And on collateral review, Division Two held that Farnsworth's claims related to the plea

agreement had previously been rejected (Dkt. 46-3, at 283) and that he failed to show bias or an

appearance of unfairness related to the trial court's ruling.  *See* Dkt. 46-3, at 285.

In support of his habeas petition, petitioner can point to nothing more than the adverse

nature of the ruling to show any bias against him, and as discussed above, dissatisfaction with

adverse rulings is not, standing alone, a viable basis for a claim of judicial bias.  Petitioner fails

to show that the state court unreasonably applied federal law when rejecting his judicial bias

claim.

Nor does the Court find that petitioner has alleged a colorable claim of violation of his

right of confrontation.  The "Constitution permits judges to exclude evidence that is repetitive,

only marginally relevant or poses an undue risk of harassment, prejudice or confusion of the

issues."  *Holmes*, 547 U.S. at 325–26.  The exclusion of the plea agreement was not

unreasonable, arbitrary, or disproportionate to the purpose that the relevant rules of evidence

were designed to serve.  *See Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1037

(9th Cir. 2005). As the state courts reasoned here, because the jury was aware of McFarland's

plea agreement, even if McFarland was not accurate about the details, petitioner was able to

challenge McFarland's credibility by developing McFarland's motive to testify truthfully.

Moreover, the state courts also recognized that the trial court judge had discretion to disallow the

plea agreement where it ran a risk of confusing the jury.

Therefore, petitioner fails to show that the state courts unreasonably applied clearly

established federal law in rejecting his claims.

## C.  Discovery Reviewed by McFarland

1    Petitioner argues that the trial court evinced judicial bias and violated his constitutional

2    rights when it failed to allow admission of the discovery documents from which McFarland

3    purportedly learned that petitioner had implicated McFarland. *See* Dkt. 67, at 57; Dkt. 68, at 9.

4    This appears to be a reference to the trial court's ruling excluding police reports and other

5    discovery documents from McFarland's case that defense counsel sought to use to impeach

6    McFarland's testimony. *See* Dkt. 77-1, at 799–800, 849. As previously noted, the trial court's

7    decision was grounded on concerns about lack of meaningful inconsistency between

8    McFarland's testimony and the police reports and the admission of irrelevant evidence.

9    On collateral review, Division Two rejected petitioner's judicial bias claim in this

10    respect, explaining that petitioner did not show bias or an appearance of unfairness. *See* Dkt. 46-

11    3, at 285. Subsequently, the State supreme court commissioner concluded that petitioner

12    "demonstrate[d] no actual and substantial prejudice nor a complete miscarriage of justice in

13    relation to" his arguments about the discovery documents. *See* Dkt. 46-3, at 332. Here,

14    petitioner's judicial bias argument again reiterates dissatisfaction with an adverse ruling and does

15    not provide a basis for finding a constitutional violation.

16    And regarding his claim that refusal to admit this evidence violated his constitutional

17    rights of confrontation, again, the trial court judge had latitude to exclude evidence that was

18    "only marginally relevant or pose[d] an undue risk of harassment, prejudice or confusion of the

19    issues." *Holmes*, 547 U.S. at 325–26. Petitioner argues that somewhere in the discovery, there

20    would have been evidence to impeach McFarland's testimony. But petitioner has not shown that

21    the state courts' rejection of petitioner's confrontation claim unreasonably applied Supreme

22    Court precedent or was based on an unreasonable determination of the facts. Petitioner has not

23    shown that the trial court wrongly concluded that the evidence to be admitted would be largely

24

1   irrelevant and confusing, where petitioner could not identify precise documents that would be

2   contrary to McFarland's testimony and sought admission of "discovery."   Notably, McFarland

3   testified at one point that he was not even sure if his recollection was based on discovery

4   documents, or something else entirely.  Dkt. 16-4, at 1626–27.  Therefore, even if McFarland

5   had been confronted with discovery that did not contain any of petitioner's statements

6   implicating McFarland, McFarland could have consistently explained that he learned of

7   petitioner implicating him from some other source.  Petitioner's argument that the ruling violated

8   his right of confrontation is unpersuasive.

9                              **D.  Argument Regarding Wig and Glasses**

10              Petitioner argues that the trial court improperly found that prior robberies involved a wig

11   and glasses and required the prosecutor to describe prior robberies as involving "reading

12   glasses."  Dkt. 67, at 62–65.  Petitioner argues that the trial court erred by failing to correct the

13   prosecutor's reference to the prior robberies during the opening statement.  Dkt. 67, at 66; Dkt.

14   68, at 14.

15              Again, this Court has fully analyzed this issue and concluded that the Washington courts

16   did not unreasonably apply clearly established federal law when it rejected petitioner's argument

17   on the merits of this claim.  *See supra*, parts II(C), III(E).  None of this evidence was presented

18   to the jury and, related to the opening statement, the trial court repeatedly told the jury that the

19   lawyers' arguments were not evidence.  *E.g.*, Dkt. 77-1, at 536, 648.  As discussed above, this

20   was not a violation of due process—nor the right of confrontation.  *See Frazier v. Cupp*, 394

21   U.S. 731, 734–35 (1969).  Nor does petitioner explain how these statements deprived him of the

22   right to present a complete defense, where the trial court was amenable to allowing evidence of

23   the prior convictions.  Although petitioner disagrees with the trial court's handling of this issue,

24

1  petitioner does not point to anything in the record that shows that the trial court ruled against

2  petitioner on this issue because of bias toward petitioner.

3       Therefore, petitioner fails to show that the state court's rejection of these claims was an

4  unreasonable application of clearly established federal law or unreasonable determination of the

5  facts.

6                        **E.  Rude Conduct at Western State Hospital**

7       Petitioner argues that the trial court unconstitutionally allowed the evidence of his rude

8  conduct toward McFarland at Western State Hospital and that this evidence violated his right to a

9  fair trial because it amounted to evidence of his character.  *See* Dkt. 67, at 86; Dkt. 68, at 13–14.

10      At petitioner's trial, his counsel moved to prevent McFarland from testifying about an

11 incident of petitioner's rude conduct toward McFarland, arguing that this was improper use of a

12 prior "bad act" to attack petitioner's credibility under Washington Rule of Evidence 608.  *See*

13 Dkt. 46-4, at 1442, 1444.  The prosecutor objected on the basis that she sought to provide

14 evidence of McFarland's motive to testify, including that petitioner had, in McFarland's view,

15 breached his obligation to stay quiet.  Dkt. 46-4, at 1443.  The trial court concluded that the

16 evidence was admissible on redirect, if petitioner challenged McFarland's motive to testify,

17 because the probative value of the evidence was not substantially outweighed by a danger of

18 unfair prejudice.  Dkt. 46-4, at 1447–48.

19      On redirect during McFarland's testimony, after defense counsel challenged McFarland's

20 motivations, the prosecutor inquired about the incident.  McFarland testified that he and

21 petitioner had made rude gestures to each other and that petitioner had then made a vulgar

22 gesture toward McFarland and called him a "stool pigeon."  Dkt. 77-1, at 836.  McFarland

23

24

explained that after this incident, he decided not to "cover up" for petitioner and that McFarland

would testify against him. *See* Dkt. 77-1, at 837, 839–40.

In his direct appeal, petitioner argued that it was error for the trial court to allow

McFarland to testify about petitioner's conduct, but Division Two disagreed. Dkt. 46-1, at 299.

The appellate court also rejected petitioner's claim that the State "overstated" the probative value

of the evidence. Dkt. 46-1, at 299. The Supreme Court also addressed this issue on direct

appeal, explaining,

> In this case, the State elicited testimony not to show that Farnsworth was dangerous
> or acting in conformity with his conduct, but rather to offer evidence of
> McFarland's motive to testify against him. . . . Since the purpose of eliciting the
> testimony was to show McFarland's motive to testify against Farnsworth, it was
> not error to allow it under ER 404(b).

Dkt. 46-1, at 46.

The premise for petitioner's claim of judicial bias is, again, the adverse nature of the

ruling. *See* Dkt. 68, at 13, 21. Regarding his fair trial claim, petitioner cannot show a violation

of clearly established federal law because there is no clearly established federal law on this point.

Because the United States Supreme Court has specifically reserved ruling on the issue regarding

whether introduction of propensity evidence in a state criminal trial could violate federal due

process and has denied certiorari at least four times on the issue since, there is no "clearly

established federal law" applying to such a claim, thereby precluding habeas relief where 28

U.S.C. § 2254(d)(1) applies. *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006). Thus the

state court adjudication of this claim cannot be contrary to or an unreasonable application of

clearly established federal law regarding introduction of prejudicial evidence other than

propensity evidence. *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *Wright v.*

*Van Patten*, 552 U.S. 120, 125–26 (2008). Petitioner therefore fails to show that the state courts

unreasonably applied clearly established federal law to his claims.

1    **F. Reaction when Writing Sample Requested**

2       Petitioner argues that the trial court unconstitutionally allowed evidence of petitioner's

3    reaction when the detective sought a writing sample, evincing judicial bias and violating his right

4    to a fair trial. *See* Dkt. 67, at 93; Dkt. 68, at 13.

5       On direct appeal, Division Two explained that this argument failed because petitioner had

6    not objected on this ground at trial and because petitioner could not explain how his right to

7    remain silent was violated. Dkt. 46-1, at 299. The state supreme court ruled that petitioner

8    failed to show manifest error in admitting the detective's testimony about petitioner's reaction

9    where "McFarland's detailed testimony implicating Farnsworth had a much greater impact. . . ."

10   Dkt. 46-1, at 47. On collateral review, the state supreme court commissioner ruled that petitioner

11   had failed to provide any authority "for the for the notion that evidence of his refusal to comply

12   with an order to provide a handwriting sample itself constitutes an impermissible comment on

13   his right to remain silent," in the context of petitioner's prosecutorial misconduct claim. Dkt. 46-

14   3, at 333.

15      As discussed above, the testimony and argument about petitioner's loud and angry

16   reaction to being asked for a handwriting sample did not implicate his right to remain silent. As

17   this is the basis for petitioner's claims that he was deprived of a fair trial, his associated fair trial

18   claim lacks merit. Petitioner fails to show that the state courts unreasonably applied clearly

19   established federal law or unreasonably determined the facts. Nor has petitioner shown judicial

20   bias by merely claiming that a trial court ruling ran afoul of his constitutional rights.

21   **V. Sentencing Issue**

22      Petitioner asserts that the trial court improperly determined that an out-of-state conviction

23   was comparable to Washington's crime of vehicular homicide and counted that out-of-state

24

1    conviction as a "strike."  *See* Dkt. 67, at 111.  But where a state court relies solely on comparison

2    of the elements of the out-of-state conviction and the strike-eligible Washington offense, any

3    error would solely be an error of state law, and the argument is not cognizable in

4    habeas.  *See Estelle*, 502 U.S. at 67–68; *accord Casaway v. Quinn*, 389 F. App'x 666, 667 (9th

5    Cir. 2010) ("Moreover, if the state court erred in concluding that [petitioner's] out-of-state

6    convictions were legally comparable to Washington strike-eligible offenses, that error was one of

7    state law and thus is not cognizable on federal habeas review").

8        Petitioner briefly recharacterizes this issue as one of ineffective assistance of appellate

9    counsel.  Dkt. 68, at 72.  He takes issue with his appellate counsel's supposed decision "not to

10   file a motion for reconsideration or otherwise address the Court of Appeals['] decision based on

11   its misstatement of the California law."  Dkt. 68, at 72.  But petitioner's counsel did move for

12   reconsideration, including arguing that the court had misunderstood the applicable out-of-state

13   law.  *See* Dkt. 46-2, at 54.  Not only this, but petitioner's appellate counsel sought direct review

14   on the basis of the comparability arguments.  *See* Dkt. 46-2, at 75.  Petitioner fails to demonstrate

15   any basis for finding that his appellate counsel's performance was deficient, where appellate

16   counsel raised these issues on direct appeal, including on reconsideration and in the petition for

17   review.

18       **VI.  Cumulative Error**

19       Petitioner alleges cumulative error on the basis of his purported constitutional

20   deprivations.  *See* Dkt. 67, at 110.

21       "The Supreme Court has clearly established that the combined effect of multiple trial

22   court errors violates due process where it renders the resulting criminal trial fundamentally

23   unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).  "The cumulative effect of multiple

24

1    errors can violate due process even where no single error rises to the level of a constitutional

2    violation or would independently warrant reversal." *Id.*

3        Cumulative error warrants habeas relief only where the errors have "so infected the trial

4    with unfairness as to make the resulting conviction a denial of due process." *Donnelly v.*

5    *DeChristoforo*, 416 U.S. 637, 643 (1974).  Such "infection" occurs where the combined effect of

6    the errors had a "substantial and injurious effect or influence on the jury's verdict." *Brecht*, 507

7    U.S. at 637 (internal quotations omitted).  In simpler terms, where the combined effect of

8    individually harmless errors renders a criminal defense "far less persuasive than it might

9    [otherwise] have been," the resulting conviction violates due process. *See Chambers v.*

10   *Mississippi*, 410 U.S. 284, 294 (1973).

11        Cumulative error has been found where there is a "unique symmetry" of otherwise

12   harmless errors, such that they amplify each other in relation to a key contested issue in the

13   case. *See Parle v. Runnels*, 505 F.3d 922, 933 (9th Cir.2007).  This case does not present such a

14   situation.  Most of petitioner's arguments fail to show constitutional error, harmless or not.  For

15   instance, it was not constitutional error for the prosecutor to comment on expected evidence of

16   petitioner's prior convictions during the opening statement or to elicit testimony of petitioner's

17   reaction to being ordered to provide his handwriting sample.  And petitioner has failed to provide

18   more than speculation that the surveillance videos captured exculpatory evidence.

19        Regarding the remainder of petitioner's arguments, McFarland's plea agreement was not

20   admitted as evidence, but the jury nevertheless was well aware that McFarland was receiving a

21   substantial benefit for his testimony.  The jury was also informed that McFarland had committed

22   crimes including theft, notwithstanding the ruling to exclude McFarland's prior conviction.  In

23   addition, petitioner has failed to show that the discovery documents contained information that

24

1 would have been squarely inconsistent with McFarland's testimony—particularly where

2 McFarland testified to some uncertainty about how he allegedly learned of petitioner implicating

3 him.  For these reasons, the Court finds that petitioner has not shown cumulative error.

### IFP ON APPEAL

5     Petitioner's *in forma pauperis* ("IFP") status should be revoked for purposes of an appeal

6 of this matter.  IFP status on appeal shall not be granted if the district court certifies "before or

7 after the notice of appeal is filed" "that the appeal is not taken in good faith[.]"  Fed. R. App. P.

8 24(a)(3)(A); *see also* 28 U.S.C. § 1915(a)(3).  A petitioner satisfies the "good faith" requirement

9 if he seeks review of an issue that is "not frivolous," and an appeal is frivolous where it lacks any

10 arguable basis in law or fact.  *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977); *Neitzke v.*

11 *Williams*, 490 U.S. 319, 325 (1989).  Appeal from this matter would be frivolous, so that IFP

12 status should be revoked for purposes of any appeal.

### CERTIFICATE OF APPEALABILITY and EVIDENTIARY HEARING

14     Petitioners seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

15 court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

16 (COA) from a district or circuit judge.  A certificate of appealability may issue only if petitioner

17 has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. §

18 2253(c)(2).  Petitioner satisfies this standard "by demonstrating that jurists of reason could

19 disagree with the district court's resolution of his constitutional claims or that jurists could

20 conclude the issues presented are adequate to deserve encouragement to proceed further."

21 *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484

22 (2000)).  Pursuant to this standard, this Court concludes that petitioner **is not** entitled to a

23 certificate of appealability with respect to this petition.

24

1    Regarding whether petitioner is entitled to an evidentiary hearing, the decision to hold a

2    hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

3    "[A] federal court must consider whether such a hearing could enable an applicant to prove the

4    petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."

5    *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. §

6    2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v.*

7    *Pinholster*, 131 S.Ct. 1388 (2011). A hearing is not required if the allegations would not entitle

8    petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan,* 550 U.S. at 474. "It follows that if the

9    record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

10   court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen,* 131 S. Ct. 1388

11   (2011). "[A]n evidentiary hearing is not required on issues that can be resolved by reference to

12   the state court record. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). Under this

13   standard, the Court finds it unnecessary to hold an evidentiary hearing.

**CONCLUSION**

15   The habeas petition (Dkt. 67) should be denied, the action should be dismissed with

16   prejudice, and the case should be closed. No certificate of appealability should issue, and IFP

17   status should be revoked for purposes of any appeal.

18   Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

19   fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

20   6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

21   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

22   objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

23   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

24

imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

September 17, 2021, as noted in the caption.

Dated this 31st day of August, 2021.

J. Richard Creatura
Chief United States Magistrate Judge